# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **NICOLAS EVANS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:15-cv-02241-MHH** |
| | } | |
| **FACCO USA, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Nicolas Evans has sold poultry products for most of his adult life. Most recently, Mr. Evans worked for defendant FACCO USA, Inc. as a sales representative. A written employment agreement governed the terms of Mr. Evans's employment relationship with FACCO. That relationship soured, and Mr. Evans resigned from FACCO in September 2015.

In this action, Mr. Evans claims that FACCO failed to pay him commissions due under the employment agreement for 2013, 2014, and 2015. Mr. Evans also alleges that FACCO has interfered with his business relationships by attempting to enforce invalid restrictive covenants contained in the employment agreement. FACCO filed a counterclaim against Mr. Evans for breach of contract. FACCO

contends that the restrictive covenants are valid, and the company asks the Court to enforce those covenants.

The parties' have filed cross-applications for a preliminary injunction.[1]  Mr. Evans wants to work for Tecno, one of FACCO's competitors.  Mr. Evans asks the Court for permission to contact his former FACCO customers and solicit their business on behalf of Tecno.  FACCO contends that Mr. Evans is bound by the non-solicitation provision outlined in his employment agreement.  FACCO asks the Court to prohibit Mr. Evans from soliciting his former FACCO customers until September 2016.  For the reasons explained below, the Court grants Mr. Evans's application for a preliminary injunction but imposes some restrictions on his sales territory.

## I.      STANDARD FOR A PRELIMINARY INJUNCTION

"A party seeking a preliminary injunction bears the burden of establishing entitlement to relief."  *Scott v. Roberts*, 612 F.3d 1279, 1289 (11th Cir. 2010).  "To obtain such relief, the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable injury unless the injunction is issued; (3) that the threatened injury outweighs possible harm that the injunction may cause the opposing party; and (4) that the injunction would not disserve the

---

[1] The Court held hearings on the parties' requests for a preliminary injunction on December 23, 2015 and January 8, 2016.  A court reporter was present, and transcripts are available upon request.  Throughout this opinion, the Court cites to the hearing transcripts by date and page number.

public interest." *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1322 (11th Cir. 2015) (citing *Burk v. Augusta–Richmond Cnty.,* 365 F.3d 1247, 1262-63 (11th Cir. 2004)). "A preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant clearly carries its burden of persuasion on each of these prerequisites." *Id.* (alteration and internal quotation marks and citation omitted).

## II.    RELEVANT FACTS

FACCO is one of the world's leading producers of industrial poultry equipment.   (Doc. 1,  p.  22).    FACCO  generates  between  $40,000,000  and $50,000,000  in  annual  revenue.   (January 8, 2016 Tr., p. 5).   FACCO has 18 employees, including five sales representatives.  Luca Finco is the president and general manager.  He also works as a sales representative.  (January 8, 2016 Tr., pp. 4-5; PX 2, January 8, 2016 hearing).

FACCO sells and installs large chicken cages and houses that can hold between  100,000  and  500,000  chickens.    (December  23,  2015  Tr.,  p.  33). FACCO's customers sell eggs to major retailers like Wal-Mart and Costco.  The cages that FACCO designs, installs, and maintains have water systems, ventilation systems, and waste belts.  (December 23, 2015 Tr., p. 33).  FACCO custom designs  and  builds  the  cages  to  meet  the  unique  needs  of  its  customers.

Information about FACCO's costs and pricing is confidential. (January 8, 2016 Tr., pp. 5-6, 45; PX 2, January 8, 2016 hearing).

FACCO's largest customers are Braswell Foods, Simpson, Jackson Jordan, Dixie Egg, Latham Farms, Country Charm, and Green Valley. Braswell Foods and Simpson are located in North Carolina. Jackson Jordan is located in Louisiana. Dixie Egg, Latham Farms, and Country Charm are located in Georgia. Green Valley is located in Virginia. (January 8, 2016 Tr., pp. 67-68).

Tecno is one of FACCO's competitors. Tecno split from FACCO more than three years ago. (January 8, 2016 Tr., p. 9). Tecno is half the size of FACCO. Larry Horst is Tecno's only sales representative in the United States. (January 8, 2016 Tr., p. 9). Mr. Horst worked for FACCO until 2005. (January 8, 2016 Tr., p. 10).

FACCO, Tecno, and a handful of other companies compete to supply all of the housing needs of the U.S. poultry industry. Product sales are built on relationships. (December 23, 2015 Tr., p. 39). FACCO spent 13 years establishing its sales network and recruiting current customers. (January 8, 2016 Tr., p. 9). Most of Mr. Evans's customers at FACCO were individuals he has known for 15 to 20 years. (December 23, 2015 Tr., p. 34). Developing relationships with customers takes time, in part, because the sales process spans months, and customers purchase expensive products. (January 8, 2016 Tr., p. 56). A salesman

may spend two or three months discussing a particular project with a customer before the sale is finalized. Then it may take nine to 12 months to build and install the finished product. (December 23, 2015 Tr., p. 4).

In 2009, FACCO hired Mr. Evans as a sales representative because of Mr. Evans's customer relationships. (December 23, 2015 Tr., p. 4; January 8, 2016 Tr., p. 11). When Mr. Evans went to work for FACCO, FACCO asked Mr. Evans to sign an employment agreement that counsel for FACCO prepared. (January 8, 2016 Tr., p. 36). The agreement governed the terms and conditions of Mr. Evans's employment with FACCO. (Doc. 1, p. 22, 43-52). The employment agreement states:

> 2.   **TERM.**   The original term of the employment shall be approximately eighteen months commencing June ___, 2009 and continuing through December 31, 2009. Thereafter, the Agreement shall renew automatically for additional one year terms unless terminated by either party pursuant to and in accordance with Section 9.04 of this Agreement.[2]

> 3. **POSITIONS AND DUTIES**

> 3.01 **SERVICE WITH FACCO.** During the term of this Agreement, Evans agrees to perform such reasonable employment duties as the Board of Directors and/or the officers of FACCO shall assign to him from time to time. Evans [sic] primary duties shall be to act as a sales representative for FACCO and its related entity FACCO, Spa. in the following states: Alabama, Arkansas, Colorado, Connecticut, Delaware, Florida, Kansas, Kentucky, Louisiana, Maine, Maryland,

---

[2] The blank after June is blank in the original employment agreement. A handwritten note on the agreement amends December 31, 2009 to December 31, 2010. (*See* Doc. 1, p. 43).

Massachusetts, Mississippi, Missouri, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia and West Virginia.

. . .

4. **COMPENSATION.**

4.01 **BASE SALARY.**  As compensation in full for all services to be rendered by Evans under this Agreement during the term of this Agreement, FACCO shall pay to Evans an annual base salary of $65,000.00, and which salary shall be paid in installments of $_____ each on the ____ day of each month during the term of this Agreement.

4.02  **OTHER COMPENSATION.**  In addition to the base salary described in section 4.01, Evans shall be entitled to receive additional compensation as set forth in Exhibit "A" which is attached hereto and incorporated by reference.

. . .

(Doc. 1, pp. 43-44) (blanks in original).  Exhibit A to the employment agreement is a document titled "COMMISSION SCHEDULE."  (Doc. 1, p. 50).  The commission schedule provides:

Evans shall be entitled to receive a commission for sales based on the following schedules:

a. 0.5% for contracts less than $2,000,000 USD
b. 0.25% for contracts for more than $2,000,000 USD
c. 0.25% on any contract with Country Charm or Simpson

Commissions will be paid ONLY after delivery of goods AND receipt of payment for said delivery of goods by FACCO.

(Doc. 1, p. 50) (emphasis in original).

The employment agreement contains a provision regarding confidential information:

> 6. **CONDFIDENTIAL INFORMATION.** Except as permitted or directed by FACCO's Board of Directors, during the term of this Agreement or at any time thereafter Evans shall not divulge, furnish or make accessible to anyone or use in any way (other than in the ordinary course of the business of FACCO) any confidential or secret knowledge or information of FACCO which Evans has acquired or become acquainted with or will acquire or become acquainted with prior to the termination of the period of his employment by FACCO (including employment by FACCO or any affiliated companies prior to the date of this Agreement), whether developed by himself or by others, concerning any trade secrets, confidential or secret designs, processes, formulae, plans, devices or material (whether or not patented or patentable) directly or indirectly useful in any aspect of the business of FACCO, and customer, client or employee lists of FACCO, and confidential or secret development or research work of FACCO, or any other confidential information or secret aspects of the business of FACCO. Evans acknowledges that the above-described knowledge or information constitutes a unique and valuable asset of FACCO and represents a substantial investment of time and expense by FACCO and its predecessors, and that any disclosure or other use of such knowledge or information other than for the sole benefit of FACCO would be wrongful and would cause irreparable harm to FACCO. Both during and after the term of this Agreement, Evans will refrain any acts or omissions that would reduce the value of such knowledge or any knowledge or information which is now published or which subsequently becomes generally publicly known in the form in which it was obtained from FACCO, other than as direct or indirect result of the breach of this Agreement by Evans.

(Doc. 1, p. 45). The employment agreement also contains non-competition and non-solicitation provisions. Those provisions state:

7

8.  **NONCOMPETITION COVENANT.**

8.01 **AGREEMENT NOT TO COMPETE.** Evans agrees that, during the term of his employment by FACCO and for a period of three (3) months after the termination of such employment (whether such termination is with or without cause, or whether such termination is occasioned by Evans or FACCO), Evans shall not work for, directly or indirectly, in any manner or capacity (e.g., as an advisor, principal agent, partner, officer, stockholder, employee, member of any association), or solicit any business similar to the type of business conducted by FACCO, or solicit or accept the business or employment of any customers, clients or employees of FACCO. The prohibition of solicitation in the preceding sentence shall continue for a period of twelve (12) months after the termination of employment.

8.02 **GEOGRAPHIC EXTENT OF COVENANT.** That because of the nature of the business of FACCO and its competitors, the obligation of Evans under Section 8.01 shall apply to the states listed in Paragraph 3.01 or any other geographic area in which FACCO

> a. has engaged in business during the term of this agreement through production, promotional sales or marketing activity, or otherwise, or

> b. has otherwise established its goodwill, business reputation, or any customer, client or employee relations.

(Doc. 1, pp. 45-46).[3]

The employment agreement contains a choice of law provision that states:

"This Agreement is made under and shall be governed by and construed in

---

[3] Mr. Evans resigned on September 20, 2015. Therefore, the three-month restriction on his ability to work for one of FACCO's competitors expired on December 20, 2015. Any dispute about Mr. Evans's ability to work for a competitor is moot. Thus, the remaining dispute concerning the restrictive covenant relates to the 12-month restriction on Mr. Evans's ability to solicit and contact his former FACCO customers.

8

accordance with the laws of the State of Minnesota." (Doc. 1, p. 47). The employment agreement also provides: "No amendments or modifications of this Agreement shall be deemed effective unless made in writing and signed by the parties hereto." (Doc. 1, p. 48).

Although Mr. Evans's employment agreement places 28 states in his sales territory, Mr. Evans testified that FACCO hired him to sell chicken cages and houses primarily in the southeastern United States. (Doc. 1, p. 43; December 23, 2015 Tr., p. 4). Mr. Evans worked for FACCO out of his home office in Cullman, Alabama. (Doc. 1, p. 22; Doc. 6, ¶ 9). Mr. Evans maintained relationships with current FACCO customers and recruited new FACCO customers. (Doc. 1, p. 22; Doc. 6, ¶ 9). When Mr. Evans started working for FACCO, FACCO's only two customers in the southeast were Country Charm and Simpson. (December 23, 2015 Tr., pp. 5, 7). Mr. Evans recruited several customers to FACCO, including Dixie Egg and Green Valley. (December 23, 2015 Tr., pp. 20-21).

Generally, a customer would contact Mr. Evans with specific plans for a new chicken house. (December 23, 2015 Tr., p. 34). FACCO then would provide Mr. Evans with a quote, blueprints, and other information necessary to initiate a particular sale. (January 8, 2015 Tr., p. 13). Mr. Evans did not prepare price quotes, and he did not have access to the information required to price a particular job for a customer. (December 23, 2015 Tr., p. 30). Mr. Finco and two other

FACCO employees prepared price quotes.  (December 23, 2015 Tr., p. 40; January 8, 2016 Tr., p. 41).

During his employment with FACCO, Mr. Evans did not receive information about new products.    (December 23, 2015 Tr., p. 29).  Mr. Evans never received a complete list of FACCO customers.  (December 23, 2015 Tr., pp. 29, 40).  Mr. Evans knew generally what customers paid for a final product at the conclusion of a sale, but Mr. Evans is not aware of FACCO's price margins because a customer's ultimate purchase price for a particular chicken house might change based on negotiations with Mr. Finco.  (December 23, 2015 Tr., pp. 30, 40).  Mr. Evans admits that he could use the final price information to his advantage at one of FACCO's competitors "to a certain extent."  (December 23, 2015 Tr., p. 31).

Mr. Evans's commissions were tied directly to sales.  Pursuant to Mr. Evans's employment agreement, FACCO was obligated to pay Mr. Evans a sales commission after FACCO installed the finished cages and houses and the customer paid FACCO for the project.  (Doc. 1, p. 50).  FACCO paid Mr. Evans commissions for his sales in 2009, 2010, and 2011.  (December 23, 2015 Tr., p. 7).  The employment agreement does not provide a time for commission payments; however, FACCO's standard procedure was to pay a previous year's commissions at the beginning of the following year.  (January 8, 2016 Tr., pp. 16, 46).

Mr. Evans did not receive his 2012 commission in early 2013.  (January 8, 2016 Tr., p. 46).[4]  In late 2012 and throughout 2013, Mr. Evans asked Mr. Finco about his 2012 commissions.  (Doc. 1, p. 28; December 23, 2015 Tr., p. 8).  Mr. Finco said he would look into the issue, but FACCO did not pay Mr. Evans the 2012 commissions.  (Doc. 1, p. 28).

In October 2013, Mr. Evans had the opportunity to meet with Mr. Finco to discuss his commissions when the men attended the United Egg Producers annual meeting in Asheville, North Carolina.  Mr. Finco told Mr. Evans that he would have to forfeit his 2013 commissions to receive his 2012 commissions.  Mr. Finco also set a sales floor for future commissions.  He told Mr. Evans that his annual sales must exceed 4,000,000 before he could receive commissions.  (Doc. 1, p. 28; December 23, 2015 Tr., pp. 9-10; January 8, 2016 Tr., pp. 17-18).  Mr. Finco regarded that conversation as an oral modification of Mr. Evans's employment agreement; none of the terms of the alleged modification were reduced to writing. (December 23, 2015 Tr., p. 32; January 8, 2016 Tr., pp. 17-18).

Mr. Evans testified that Mr. Finco set the sales floor for commissions at 4 million United States dollars.  (December 23, 2015 Tr., pp. 10, 27).  Mr. Finco testified that he told Mr. Evans that Mr. Evans needed to sell at least 4 million euros worth of products to receive the commissions.  (January 8, 2016 Tr., p. 17).

---

[4] Mr. Evans testified that he had approximately $4,000,000 in sales in 2012, and the unpaid commissions for that year total approximately $25,000.  (December 23, 2015 Tr., p. 8).

Mr. Finco also testified that in exchange for the modification to the employment agreement, Mr. Evans kept his job with FACCO. (January 8, 2016 Tr., p. 18).  Mr. Evans continued to work for FACCO through 2015.  (December 23, 2015 Tr., pp. 27-28).

FACCO finally paid Mr. Evans's 2012 commission on April 30, 2014. (Doc. 1, p. 28).  To date, FACCO has not paid Mr. Evans commissions for 2013, 2014, or 2015.  (January 8, 2016 Tr., p. 57).  Mr. Evans believes that FACCO owes him between $35,000 and $50,000 in unpaid commissions.   (Doc. 1, p. 29; December 23, 2015 Tr., pp. 39-40).   Mr. Evans believes he sold close to $2,000,000 in products in 2013.   (December 23, 2015 Tr., p. 10).   Mr. Finco testified that Mr. Evans was responsible for approximately $3,000,000 in sales in 2014.  (January 8, 2015 Tr., p. 19).  Mr. Evans thought his sales were higher.  He testified that he sold between $3,500,000 and $4,000,000 in products in 2014. (December 23, 2015 Tr., pp. 10-11).

Mr. Evans's disagreement with FACCO over his commissions prompted Mr. Evans to consider leaving FACCO.  A meeting in the spring of 2015 caused Mr. Evans to think more seriously about resigning.  In late April or early May 2015, Mr. Evans and Mr. Finco went to dinner with Brent Booker from Country Charm.  Country Charm is one of FACCO's most important customers.  At dinner, Mr. Finco told Mr. Booker that no matter how many sales Mr. Evans had, Mr.

12

Evans did not receive commission. (December 23, 2015 Tr., p. 37; January 8, 2016 Tr., p. 55). Three or four weeks later, Mr. Evans saw Mr. Horst at a convention, and Mr. Horst suggested that Mr. Evans should work for Mr. Horst at Tecno. (December 23, 2015 Tr., p. 38). Several weeks later, Mr. Horst visited Mr. Evans at his home in Cullman, Alabama. (December 23, 2015 Tr., p. 28). In August 2015, Mr. Evans told Mr. Finco that he had an opportunity to work for Tecno. (December 23, 2015 Tr., p. 13). When Mr. Evans tried to resign, Mr. Finco asked Mr. Evans to meet with him to try to renegotiate Mr. Evans's contract with FACCO. (December 23, 2015 Tr., pp. 11-13).

On September 3, 2015, Mr. Evans and his wife met with Mr. Finco at Mr. Finco's Chicago, Illinois home. (Doc. 1, p. 29; December 23, 2015 Tr., pp. 11-12; January 8, 2016 Tr., pp. 21-22).[5] During the meeting, Mr. Evans and Mr. Finco did not reach an agreement about Mr. Evans's contract, but according to Mr. Evans, Mr. Finco agreed to pay Mr. Evans his 2014 commissions within two weeks and his 2015 commissions in April 2016. (December 23, 2015 Tr., pp. 11-12). Two weeks later, Mr. Finco explained that Mr. Evans would have to sign a new employment agreement to receive his 2014 commissions. (Doc. 1, p. 29;

---

[5] Mr. Evans's wife prepared a handwritten document that Mr. Evans and Mr. Finco used during their discussion. The document lists several provisions from Mr. Evans's 2009 employment agreement and contains notes and questions about those provisions. (DX3, December 23, 2015 hearing).

December 23, 2015 Tr., p. 12).   Mr. Evans refused to sign a new employment agreement.  (December 23, 2015 Tr., pp. 12-13).

On September 20, 2015, Mr. Evans called Mr. Finco and sent Mr. Finco an email to inform FACCO that he was resigning.  (Doc. 1, p. 29; December 23, 2015 Tr., p. 13).   Mr. Finco wrote a letter to Mr. Evans on September 23, 2015 and acknowledged Mr. Evans's resignation.  (Doc. 1, p. 53; December 23, 2015 Tr., p. 15).[6]  Mr. Finco reminded Mr. Evans that his employment agreement with FACCO contained non-competition and non-solicitation provisions.  The letter concludes, "We trust that you will abide by the above obligations, and take any and all necessary steps to refrain from violating your contractual obligations, to the fullest extent required by law.  Should you not, Facco shall be [sic] promptly pursue all available legal remedies to protect its rights."  (Doc. 1, p. 53; PX 2, December 23, 2015 hearing).

After he received Mr. Finco's September 23, 2015 letter, Mr. Evans contacted an attorney. (December 23, 2015 Tr., p. 17).   Mr. Evans's attorney replied to Mr. Finco's letter on September 29, 2015.  (Doc. 1, p. 55).   The letter from Mr. Evans's attorney explained why the attorney believed that FACCO could not enforce the non-competition and non-solicitation provisions of Mr. Evans's employment contract.  (Doc. 1, p. 55).   Mr. Evans did not receive a response from

---

[6] Mr. Finco testified that he originally did not accept Mr. Evans's resignation.  (January 8, 2016 Tr., p. 26).

FACCO until October 27, 2015, when an attorney representing FACCO wrote a letter to Mr. Evans's attorney and warned:

> [S]hould Mr. Evans decide to join a competitor of Facco before the expiration of the three-month non-compete covenant period, or solicit business from customers of FACCO before the expiration of the twelve-month non-solicitation covenant period, that would constitute a complete breach and violation of the [employment agreement]. Additionally, by soliciting Facco's customers, Mr. Evans and his current employer (if any) may be tortiously interfering with the agreements and/or business relations between Facco and its customers.
>
> In the event your client is in breach of the [employment agreement], a lawsuit will be commenced against him and his current employer, and Facco would seek a temporary restraining order against him. . . as well as seek damages for breach of contract and tortious interference.

(Doc. 1, pp. 58-59; PX 4, December 23, 2015 hearing).

Before Mr. Evans received the October 27, 2015 letter from FACCO's attorney, he contacted two FACCO customers, Dennis Hughes from Dixie Egg and Rodney Wagner from Green Valley.  (December 23, 2015 Tr., pp. 17, 20-21).  In November or December 2015, Tecno hosted Mr. Hughes and Dixie Egg at Tecno's manufacturing facility in Pavoda, Italy.  (December 23, 2015 Tr., p. 20; January 8, 2016 Tr., p. 31).  Mr. Evans was not present for the meeting, and he did not arrange the meeting.  (December 23, 2015 Tr. pp. 20-21; January 8, 2016 Tr., p. 43).  Mr. Evans met with Mr. Wagner in Virginia to discuss Green Valley's plans to build a new chicken house.  (December 23, 2015 Tr., p. 21).  When Mr. Evans

received the October 27, 2015 letter from FACCO's attorney, Mr. Evans stopped communicating with Dixie Egg and Green Valley. (December 23, 2015 Tr., p. 21).

Mr. Evans performed other work on behalf of Tecno after resigning from FACCO. On September 22, 2015, two days after he resigned from FACCO, Mr. Evans reserved the entity name "Tecno Poultry South, LLC" with the Alabama Secretary of State's Office. (December 23, 2015 Tr., p. 24; DX 3, December 23, 2015 hearing). On October 7, 2015, Mr. Evans signed articles of incorporation for Tecno Poultry South, LLC and submitted a certificate of formation to the Cullman County, Alabama probate judge. On October 9, 2015, the Cullman County, Alabama probate judge recorded Tecno Poulty South, LLC's certificate of formation. (December 23, 2015 Tr., p. 24; DX 3, December 23, 2015 hearing).

Mr. Evans has not signed a contract with Tecno, and Tecno is not paying him a salary. (December 23, 2015 Tr., p. 16). Mr. Horst personally loaned Mr. Evans approximately $24,000.[7] (December 23, 2015 Tr., pp. 16, 26). Mr. Evans still has a laptop computer that FACCO provided to him, and Mr. Evans has used his FACCO laptop to conduct business for Tecno. (December 23, 2015 Tr., p. 37). Mr. Evans does not believe any confidential information from FACCO is saved on the computer, and he does not believe that he has used any information stored on

---

[7] There is no written document explaining the terms of the loan. Mr. Evans testified that he plans to repay the loan when he goes to work for Tecno. (December 23, 2015 Tr., pp. 26-27).

16

his FACCO computer to help Tecno.  (December 23, 2015 Tr., p. 40).   According to Mr. Finco, the laptop may contain blueprints, quotes, technical details, and product information; however, Mr. Finco has no proof that Mr. Evans has used any of this information in his work with Tecno.  (January 8, 2015 Tr., pp. 26, 45).

Mr. Evans speaks with Mr. Horst by telephone between one and three times per week.  The two do not discuss business.  Although Mr. Evans has some background in the operations side of the poultry business, he is not trained to provide operations support to customers.  If Mr. Evans cannot meet with any current or potential customers within the geographic scope of the non-solicitation provision, Mr. Evans cannot perform work for Tecno.  (December 23, 2015 Tr., pp. 45-46).  It took Mr. Evans 15 to 20 years to develop the relationships he has with his former FACCO customers, and it would take him years "beyond his age" to establish new relationships comparable to those he has with his former FACCO customers.  (December 23, 2015 Tr., p. 46).

Prior to Mr. Evans's resignation, FACCO was in negotiations with Braswell Foods, Dixie Egg, Green Valley, Latham Farms, and Country Charm for contracts worth several million dollars.  (January 8, 2016 Tr., pp. 30-34).  Mr. Finco believes that FACCO lost a contract with Braswell Foods because of Mr. Evans's departure.  (January 8, 2016 Tr., p. 30).

## III.   ANALYSIS

### A.   Likelihood of Success on the Merits[8]

#### 1.   Choice of Law

Before the Court explains why Mr. Evans has demonstrated a likelihood of success on the merits of  breach of contract claim and is entitled to a preliminary injunction, the Court pauses briefly to address a choice-of-law issue that impacts the Court's analysis.   The employment agreement provides that, "[t]his Agreement is made under and shall be governed by and construed in accordance with the laws of the State of Minnesota."  (Doc. 1, p. 47).  "In Alabama, the 'right of parties to an agreement to choose a particular state's laws to govern an agreement' is well-settled, so long as the choice-of-law provisions are not contrary to Alabama law or public policy."  *Mercedes-Benz U.S. Intern., Inc. v. Cobasys, LLC*, 605 F. Supp. 2d 1189, 1196-97 (N.D. Ala. 2009) (quoting *Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 506 (Ala. 1991)).

---

[8] As discussed below, the Court finds that Mr. Evans has demonstrated a likelihood of success on the merits of his breach of contract claim.  Therefore, the Court need not consider whether Mr. Evans has demonstrated a likelihood of success on the merits of his tortious interference with business relations claim.  *Schiavo ex rel. Schindler v. Schiavo*, 403 F. 3d 1289, app. at 1298 (11th Cir. 2005) ("Once again the critical issue is whether Plaintiffs have established a substantial likelihood of success on the merits of any one of Counts Six through Ten.") (quoting *Schiavo ex rel. Schindler v. Schiavo*, 2005 U.S. Dist. LEXIS 4609, at *3 (M.D. Fla. Mar. 25, 2005)); *United States v. Jenkins,* 714 F.Supp.2d 1213, 1220 (S.D. Ga. 2008) ("In order to demonstrate that it is likely to prevail on the merits, Plaintiff need only demonstrate the likelihood of prevailing on one cause of action.").

Minnesota law conflicts with Alabama only to the extent that FACCO wishes to enforce the restrictive non-solicitation agreement.  Under Alabama law, courts will enforce the terms of restrictive covenants if: "(1) the employer has a protectable interest; (2) the restriction is reasonably related to that interest; (3) the restriction is reasonable in time and place; and (4) the restriction imposes no undue hardship."  *King v. Head Start Family Hair Salons, Inc.,* 886 So. 2d 769, 771 (Ala. 2004) (internal quotations and citation omitted).  Under Minnesota law, a court considers: "(1) whether the restraint is necessary for the protection of the business or goodwill of the employer; (2) whether the restraint is greater than necessary to adequately protect the employer's legitimate interests; (3) how long the restriction lasts; and (4) the geographic scope of the restriction."  *Harley Automotive Group, Inc. v. AP Supply, Inc.*, 2013 WL 6801221, at *9 (D. Minn. 2013) (citing *Prow v. Medtronic, Inc.,* 770 F.2d 117, 120 (8th Cir.1985)).  Because Minnesota law does not consider the undue hardship that a restrictive covenant places on an employee, Minnesota law conflicts with the "public policy of Alabama disfavoring contracts in restraint of trade."  *Construction Materials, Ltd., Inc. v. Kirkpatrick Concrete, Inc.*, 631 So. 2d 1006, 1009 (Ala. 1994).  Therefore, as explained in greater below, *see* pp. 28-32, *supra*, the Court applies Alabama law to construct the terms of the preliminary injunction.  However, Minnesota law governs the Court's analysis of

Mr. Evans's employment agreement and FACCO's conduct regarding Mr. Evans's breach of contract claim.

### 2.    Breach of Contract

Mr. Evans has demonstrated a substantial likelihood of success on the merits on his breach of contract claim against FACCO.  Under Minnesota law, "[t]he elements of a breach of contract claim are "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of contract by the defendant." *Lyon Financial Services, Inc. v. Illinois Paper and Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (internal quotation marks and citations omitted).  The employment agreement at issue provides that in addition to a base salary, FACCO would pay Mr. Evans commissions based on a schedule attached to the agreement.  Mr. Evans contends that FACCO breached the contract because FACCO has not paid him commissions for 2013, 2014, and 2015.  FACCO acknowledges that it has not paid Mr. Evans commissions for those years; however, FACCO contends that Mr. Finco and Mr. Evans orally modified the commission provisions of the written employment agreement during the men's October 2013 meeting in Asheville, North Carolina, and no commissions are due under the modified contract.  Mr. Evans has demonstrated a likelihood of success on the merits because he has

presented evidence which establishes that the alleged oral modification is not enforceable under Minnesota law.

"The general common law rule is that a written contract can be varied or rescinded by oral agreement of the parties, even if the contract provides that it shall not be orally varied or rescinded." *Larson v. Hill's Heating & Refrig. of Bemidji, Inc.*, 400 N.W.2d 777, 781 (Minn. Ct. App. 1987).[9]   "[W]hen a party asserts that there has been an enforceable oral modification of the terms of a written contract, that party 'has the burden of proving the modification [of the written contract] by clear and convincing evidence.   The burden is not met by a mere preponderance of

---

[9] Mr. Evans's counsel argued at the December 23, 2015 hearing that his employment agreement cannot be modified orally because the agreement is subject to the statute of frauds.  Minnesota has recognized that "a contract subject to the statute of frauds [can] not be modified orally." *Rooney v. Dayton–Hudson Corp.,* 246 N.W.2d 170, 175 (Minn. 1976).  "[E]very agreement that by its terms is not to be performed within one year from the making thereof" is subject to Minnesota's statute of frauds.  Minn. St. § 513.01(1). "The test is simply whether the contract by its terms is capable of full performance within a year, not whether such occurrence is likely." *Eklund v. Vincent Brass and Aluminum Co.*, 351 N.W.2d 371, 375-76 (Minn. Ct. App. 1984) (internal quotations and citation omitted) (finding the trial court erred in finding that an employment contract was subject to the statute of frauds because the contract was for permanent employment until retirement but "could have been fully performed within one year under any of the following circumstances: (1) Eklund's death, (2) Eklund voluntarily departed, or (3) Eklund failed to perform satisfactorily"); *see also Bussard v. College of St. Thomas, Inc.*, 200 N.W.2d 155, 161 (Minn. 1972) ("A contract of permanent employment is 'performable within a year' because of the possibility of death within a year."); *Roaderick v. Lull Engineering Co., Inc.*, 208 N.W.2d 761, 763 (Minn. 1973) (finding that an employment contract that provided "for a minimum of 2 years' employment" is subject to the statute of frauds).  Mr. Evans's employment contract contained no minimum term of employment.  Although not likely, the contract was capable of full performance within a year because Mr. Evans could have, for example, died, become disabled, or breached the agreement in a manner that could not be cured within 30 days. (*See* Doc. 1, pp. 46-47).  The contract also was capable of full performance within a year if FACCO decided to terminate the agreement in the "best interests of FACCO." (Doc. 1, p. 47). Accordingly, Mr. Evans's employment agreement is not subject to the statute of frauds.

the evidence.'" *Bolander v. Bolander*, 703 N.W.2d 529, 541 (Minn. Ct. App. 2005), *review dismissed* (Minn. Nov. 15, 2005) (quoting *Merickel v. Erickson Stores Corp.*, 95 N.W.2d 303, 305 (Minn. 1959)).

A valid contract requires mutual assent, which entails a "'"meeting of the minds concerning [a contract's] essential elements.'" *SCI Minnesota Funeral Servs., Inc. v. Washburn–McReavy Funeral Corp.,* 795 N.W.2d 855, 864 (Minn. 2011) (alteration in original) (quoting *Minneapolis Cablesystems v. City of Minneapolis,* 299 N.W.2d 121, 122 (Minn. 1980)).[10]   FACCO has not demonstrated by clear and convincing evidence that Mr. Finco and Mr. Evans manifested mutual assent regarding the terms of the alleged oral modification to the employment contract.

Although Mr. Finco seems to have intended to set a sales threshold that Mr. Evans would have to meet before Mr. Evans received commissions, the evidence indicates that Mr. Evans and Mr. Finco did not mutually assent to the level at which that threshold was set.   Mr. Evans understood that he needed to sell a minimum of 4,000,000 United States dollars in FACCO products.   This

---

[10] "Whether mutual assent exists is tested under an objective standard." *SCI*, 795 N.W.2d at 864; *see also Cederstrand v. Lutheran Bhd.,* 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962) ("Expressions of mutual assent, by words or conduct, must be judged objectively, not subjectively."); *Murray v. Puls*, 690 N.W.2d 337, 344 (Minn. Ct. App. 2004) ("The requisite mutual assent for the formation of a contract . . . does not require a subjective mutual intent to agree on the same thing in the same sense, but may be based on objective manifestations whereby one party by his words or by his conduct, or by both, leads the other party reasonably to assume that he assents to and accepts the terms of the other's offer.").

understanding is consistent with the written commission schedule in the 2009 employment agreement that refers to United States dollars.  Mr. Finco understood that Mr. Evans needed to sell a minimum of 4,000,000 euros in FACCO products.[11]  The currency attached to the four million dollar figure is an essential element of the alleged modification.  Because Mr. Evans and Mr. Finco did not "agree with reasonable certainty about the same thing and on the same terms," *Peters v. Mutual Benefit Life Ins. Co.,* 420 N.W.2d 908, 914 (Minn. Ct. App. 1988) (quotation omitted), on the record before the Court, FACCO has not met its burden to establish by clear and convincing evidence that the oral modification to the written commission schedule is valid.  *See Jenson v. Taco John's Int'l, Inc.*, 110 F.3d 525 (8th Cir. 1997) ("[A]n enforceable contract requires reasonable certainty

---

[11] FACCO maintains that the oral modification is valid because Mr. Evans continued to perform work for FACCO under the new terms and conditions. Although Mr. Evans believed that he was operating under a modified commission schedule, Mr. Evans and Mr. Finco did not objectively agree—either expressly or through their conduct—on the minimum sales required to receive future commissions.

Additionally, FACCO's argument that Mr. Finco's conduct demonstrates that he believed there was a valid oral modification to the terms of the commission schedule is belied by Mr. Finco's own words and actions. In April or May 2015, Mr. Finco told one of FACCO's primary customers that FACCO does not pay Mr. Evans commissions regardless of how much he sells. Additionally, on September 3, 2015, Mr. Finco agreed to pay Mr. Evans's 2014 commissions within two weeks and Mr. Evans's 2015 commissions in the spring of 2016.  Mr. Evans claims that there was no condition attached to the promise.  Mr. Finco testified that Mr. Evans had to sign a new employment agreement to receive his 2015 and 2016 commissions.  Regardless, Mr. Finco planned to pay Mr. Evans's 2014 and 2015 commissions even though according to Mr. Finco, Mr. Evans's sales had not improved and did not meet the 4,000,000 minimum.  Mr. Finco's conduct is not consistent with the alleged oral modification and undermines FACCO's position that the parties' conduct in this case suggests that the parties agreed to modify the contract orally in October 2013.

about the intent of the parties regarding the fundamental terms of the contract." (citing *Hill v. Okay Constr. Co., Inc.*, 252 N.W.2d 107, 114 (Minn. 1977))).[12]

If, then, Mr. Evans can prove that FACCO's failure to pay him commissions for his 2013, 2014, and 2015 sales constitutes a breach of the written employment agreement (and there is substantial likelihood that Mr. Evans can succeed), then under Minnesota law, Mr. Evans may prove that he is excused from complying with the restrictive covenants in the agreement.   Under Minnesota law, "'it is elementary that a breach of contract by one party excuses performance by the other'" if there is a material breach.   *Soderbeck v. Ctr. for Diagnostic Imaging, Inc.,* 793 N.W.2d 437, 441 (Minn. Ct. App. 2010) (quoting *Wasser v. W. Land Secs. Co.,* 107 N.W. 160, 162 (Minn. 1906)); *see also Assoc. Cinemas of Am., Inc. v. World Amusement Co.,* 276 N.W. 7, 10 (Minn. 1937); *Ridgeway Invs., LLC v. Glow Hospitality, LLC*, 2013 WL 4404598, at *3 (Minn. Ct. App. Aug. 19, 2013). A material breach is "'[a] breach of contract that is significant enough to permit the aggrieved party to elect to treat the breach as total (rather than partial), thus

---

[12] Because the Court finds that Mr. Evans and Mr. Finco did not mutually assent to the terms of the alleged oral modification, the Court does not consider Mr. Evans's alternative argument that Mr. Evans received no consideration for the alleged oral modification. (*See* December 23, 2015 Tr., pp. 53-54, 58).  Assuming that Mr. Evans and Mr. Finco mutually assented to the terms of the alleged oral modification, the Court would be inclined to find that Mr. Evans's continued employment with FACCO—which Mr. Finco testified Mr. Evans received in exchange for the contract modification—was adequate consideration. *See Pine River State Bank v. Mettille*, 333 N.W.2d 622, 627 (Minn. 1983) (holding that when an employee "retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation").   However, the Court need not address the issue because the Court concludes that Mr. Evans and Mr. Finco did not enter into a valid oral modification of the contract.

excusing that party from further performance and affording it the right to sue for damages.'" *BOB Acres, LLC v. Schumacher Farms, LLC*, 797 N.W.2d 723, 728-29 (Minn. Ct. App. 2011) (quoting *Black's Law Dictionary* 214 (9th ed. 2009)). "A material breach "'goes to the root or essence of the contract.'" *Id.* (quoting 15 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 44:55 (4th ed. 2000)).

FACCO's failure to pay commissions goes to the root or essence of Mr. Evans's employment agreement. Mr. Evans signed an employment agreement under which he would make sales for FACCO in exchange for certain compensation. FACCO's failure to pay Mr. Evans commissions for 2013, 2014, and 2015 is not a minor breach of the parties' agreement. Rather, the breach violates one of the principle terms contract terms. Accordingly, Mr. Evans has demonstrated a substantial likelihood of success on the merits of his breach of contract claim.[13]

---

[13] Because Mr. Evans has demonstrated a substantial likelihood of success on the merits of his breach of contract claim, FACCO cannot demonstrate a substantial likelihood of success on the merits of its claim that Mr. Evans breached the employment contract when he contacted FACCO's customers. FACCO also has not demonstrated a substantial likelihood of success on the merits of its claim that Mr. Evans breached the agreement by disclosing and using confidential information belonging to FACCO. Mr. Finco testified that Mr. Evans's laptop "may" contain information about blueprints, quotes, and other technical details. However, Mr. Finco has no proof that Mr. Evans has disclosed or used any of this information, if it is on the computer. (January 8, 2015 Tr., p. 45). Because FACCO has not demonstrated a substantial likelihood of success on the merits of its breach of contract claim against Mr. Evans, FACCO is not entitled to a preliminary injunction. *GeorgiaCarry.Org*, 788 F.3d at 1329 ("Because the plaintiffs have not shown a substantial likelihood of success on the merits, we need not consider the remaining factors in the preliminary injunction test."); *see also American Civil Liberties*

### B.     Irreparable Injury

Mr. Evans has demonstrated that he will suffer irreparable injury in the absence of a preliminary injunction.  "An injury is irreparable if it cannot be undone through monetary remedies." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (internal quotation marks and citation omitted).  "Even when a later money judgment might undo an alleged injury, the alleged injury is irreparable if damages would be 'difficult or impossible to calculate.'" *Id.* (quoting *Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 958 n. 2 (5th Cir. Unit B June 1981)).  The Court finds that the restrictions that FACCO is attempting to enforce on Mr. Evans's ability to solicit any of his former FACCO customers "are in the form of lost opportunities, which are difficult, if not impossible, to quantify." *MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005).

### C.     Injury Outweighs Harm

The threatened injury to Mr. Evans outweighs the damage that a preliminary injunction might cause FACCO.  Mr. Evans is 65 years old.  He plans to work for several more years to save for retirement.  He has spent 15 to 20 years developing relationships with his former FACCO clients.  If the Court prohibited Mr. Evans

---

*Union of Florida, Inc. v. Miami-Dade County School Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) ("Failure to show any of the four factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits.").

from contacting any of his former FACCO customers, it would take Mr. Evans years to build the relationships with new customers that Mr. Evans would need to practice the only trade he has known for nearly three decades.  FACCO has an annual revenue of $50,000,000 to $60,000,000, and the record establishes that FACCO currently is in negotiations with several of Mr. Evans's former FACCO customers for contracts worth several million dollars. Therefore, some harm will result to both parties.  Although FACCO may lose some contracts if Mr. Evans is permitted to solicit some of his former FACCO customers, FACCO retains the ability to compete with Mr. Evans and Tecno for those sales.  Even with the loss of Mr. Evans, FACCO has nearly twice as many sales representatives as Tecno.  The harm to FACCO is mitigated by FACCO's ability to use its established market presence and size to solicit current and new customers.  *See GPS Inudstries, LLC, v. Lewis*, 691 F. Supp. 2d 1327, 1338 (M.D. Fla. 2010) ("[FACCO's] desire to enforce restrictive covenants against [Mr. Evans], where it has not demonstrated that those restrictive covenants are valid or reasonable, does not outweigh the harm to [Mr. Evans] of enforcing those unreasonable restrictions.").

### D.    Public Interest

The injunction will not disserve the public interest.  The public interest generally is advanced by enforcing valid contracts.  However, no public interest is served by forcing one party to a contract to continue his performance after a

27

material breach by the other party, particularly where the breaching party attempts to enforce invalid or overly broad restrictive covenants. *Robinson v. Computer Servicenters, Inc.*, 346 So. 2d 940 (Ala. 1977) ("Testing the restrictive contract here under the particular facts of this case, it is obvious that it would be inequitable and unreasonable to enforce a contract which the employer did not intend to keep.").

## IV.   SCOPE OF PRELIMINARY INJUNCTION

Because Mr. Evans has established that he is entitled to a preliminary injunction, the Court must consider how to craft the terms of the injunction to protect the parties' competing interests until the Court resolves the merits of the parties' dispute.   As it relates to Mr. Evans's breach of contract claim, his likelihood of success on the merits would excuse his obligations under the non-solicitation provision of the employment agreement.   The Court recognizes that if it were to enter a preliminary injunction giving Mr. Evans permission to contact all of his former FACCO customers, such an injunction would not protect FACCO's interest in maintaining its goodwill and relationships with those customers should Mr. Evans ultimately fail to prove his claim.   However, even if Mr. Evans does not prevail on his breach of contract claim, FACCO could not enforce the geographic scope of the non-solicitation provision because the restriction is unreasonable as a matter of Alabama public policy.   Therefore, the Court will limit the geographical

scope of the non-solicitation provision and enter a preliminary injunction that allows Mr. Evans to contact some, but not all, of his former FACCO customers.[14]

The employment agreement places a 12-month restriction on Mr. Evans's ability to solicit his former FACCO customers in the 28 states listed in paragraph 3 of the employment agreement and in any geographic area where FACCO "has engaged in business . . . through production, promotional sales or marketing activity, or otherwise" or "has otherwise established its goodwill, business reputation, or any customer, client or employee relations."  (Doc. 1, pp. 45-46).  FACCO's customers are located across the United States and FACCO engages in business nationwide.

As written, the geographic scope of the non-solicitation provision would prevent Mr. Evans from soliciting any of his former FACCO customers.  As explained in detail above, if Mr. Evans cannot contact any of his former FACCO

_____

[14] The Court also restricts Mr. Evans's ability to contact all of his former FACCO customers in lieu of posting a bond.  Federal Rule of Civil Procedure 65(c) provides:  "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained . . . ."  Fed. R. Civ. P. 54(c).  Despite the mandatory language of the rule, the Eleventh Circuit has held that "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court  . . .[, and] the court may elect to require no security at all.'"  *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.,* 636 F.2d 1084, 1094 (5th Cir. Unit B 1981) (alterations in original)).  The Court is unsure whether Mr. Evans has the financial means to pay a cash bond, but the Court desires to protect FACCO's interests to the extent that Mr. Evans may not ultimately prevail on the merits of his claims.  A preliminary injunction that prohibits Mr. Evans from contacting all of his former FACCO customers advances that interest.

clients, he effectively cannot work until September 20, 2016.   Therefore, the geographic scope of the non-solicitation provision causes an undue hardship on Mr. Evans and is unreasonable under Alabama law. *See Nationwide Mut. Ins. Co. v. Cornutt*, 907 F.2d 1085, 1089 (11th Cir. 1990) (under Alabama law, a restrictive covenant places an undue hardship on the employee when the enforcement of the restraint "prohibit[s] a worker from engaging in the only trade that he knew and could rely upon to support his dependents") (citing *Chavers v. Copy Products of Mobile,* 519 So. 2d 942, 945 (Ala. 1988)); *Sheffield v. Stoudenmire*, 553 So. 2d 125, 126-27 (Ala. 1989) (a noncompetition agreement restricting an employee from competing within a 50-mile radius of his former employer posed an undue hardship on the employee because he was "50 years old, married, and possesse[d] significant financial obligations"); *Calhoun v. Brendle*, 502 So. 2d 689 (Ala. 1986) (finding unenforceable a 100-mile radius restriction where the employee was trained and educated only in the occupational field at issue, and the employee was supporting a wife and infant child).

Alabama law permits courts to strike unreasonable provisions of restrictive covenants.   *Cullman Broad. Co. v. Bosley*, 373 So. 2d 830, 835 (Ala. 1979) (recognizing that "[a]n agreement in restraint of trade may be divisible.   An unreasonable limitation or restriction may be striken"); *see also Mason Corp. v. Kennedy*, 244 So. 2d 585, 590 (Ala. 1971) ("[A] court of equity has the power to

enforce a contract against competition although the territory or period may be unreasonable, by granting an injunction restraining the respondent from competing for a reasonable time and within a reasonable area.").[15]   Therefore, the Court strikes from the written employment agreement the geographic restriction that would prevent Mr. Evans from contacting FACCO customers located in any state where FACCO "has engaged in business . . . through production, promotional sales or marketing activity, or otherwise" or "has otherwise established its goodwill, business reputation, or any customer, client or employee relations."   (Doc. 1, p. 46).  The preliminary injunction will prohibit Mr. Evans from contacting FACCO customers located in the 28 states listed in paragraph 3 of the employment agreement.  The preliminary injunction will not prohibit Mr. Evans from soliciting or contacting FACCO customers located in any state not listed in paragraph 3 of the employment agreement.  The preliminary injunction will require Mr. Evans to return to FACCO the laptop computer that FACCO provided to him during his

---

[15] The employment agreement also contemplates that a court may sever unenforceable terms of the agreement.  Paragraph 10.06 provides:

> To the extent any provision of this Agreement shall be invalid or unenforceable, it shall be considered deleted herefrom and the remainder of such provision and of this Agreement shall be unaffected and shall continue in full force and effect.  In furtherance and not in limitation of the foregoing, should the duration or geographical extent of, or business activities covered by, any provision of this Agreement be in excess of that which his valid and unenforceable under applicable law, then such provision shall be construed to cover only that duration, extent or activities which may validly and enforceably be covered.

(Doc. 1, p. 48).  Modifying the extent of the geographic restriction is consistent not only with applicable law but also with the parties' agreement.

employment with FACCO.  The preliminary injunction also will prohibit Mr. Evans from disclosing any confidential information that he may have obtained through his employment with FACCO.

## V.    CONCLUSION

For the reasons discussed above, the Court grants Mr. Evans's application for a preliminary injunction but restricts his sales territory.  The Court denies FACCO's cross-application for a preliminary injunction.  The Court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this January 26, 2016.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE